# 15-4131-bk

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

IN RE: STERLING UNITED, INC.,

*Debtor.*

JOHN H. RING, III, Trustee
of Chapter 7 Bankruptcy Estate of
STERLING UNITED, INC.,

*Plaintiff/Appellant,*

vs.

FIRST NIAGARA BANK, N.A.

*Defendant/Appellee.*

On Appeal from the United States District Court for
the Western District of New York

### BRIEF OF PLAINTIFF-APPELLANT ON APPEAL

Arthur G. Baumeister, Jr.
AMIGONE, SANCHEZ & MATTREY, LLP
*Attorneys for Plaintiff/Appellant*
1300 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 852-1300

# **TABLE OF CONTENTS**

**Page**

Table of Authorities .................................................................... 3

Jurisdictional Statement ........................................................... 6

Statement of the Issues Presented and Standard of Review ......................... 8

Statement of Case ................................................................... 10

Argument............................................................................ 16

FIRST NIAGARA BANK DOES NOT HOLD AN UNLIMITED BLANKET
SECURITY INTEREST HAVING PRIORITY OVER THE TRUSTEE'S
CHAPTER 5 AVOIDANCE AND STONG ARM POWERS

A. FINANCING STATEMENTS FILED BY FIRST NIAGARA
   ON FEBRUARY 19, 2013 DURING THE PREFERENCE PERIOD
   ARE LEGALLY INEFFECTIVE TO PERFECT A BLANKET
   SECURITY INTEREST ....................................................... 16

B. THE TRUSTEE'S RECOVERY CLAIMS RELATE TO THE
   PREFERENCE AND POST-PETITION PERIOD ............................... 20

C. APPLICALBE PROVISIONS OF REVISED ARTICLE 9
   OF THE UNIFORM COMMERCIAL CODE ...................................... 21

D. THE FNB UCC FILINGS DO NOT SUFFICIENTLY INDICATE
   COLLATERAL AND FAIL FOR PERFECTION PURPOSES
   PURSUANT TO U.C.C. §9502(a)(3)........................................27

E. LOCATION LIMITATIONS ON SECURITY INTEREST
   PERFECTION HAVE BEEN ENFORCED...........................................33

F. THE LINGUISTIC AMBIGUITY IN THE COLLATERAL
   DESCRIPTION WOULD NOT BE RECOGNIZED BY SOME
   READERS MAKING IT SERIOUSLY MISLEADING ...................... 36

1

G.  THE PURPOSES, POLICY AND INTENT OF REVISED
    ARTICLE NINE MUST BE INCORPORATED INTO THE
    LEGAL STANDARD FOR DETERMINING A SERIOUSLY
    MISLEADING FINANCING STATEMENT ........................................ 37

H.  RELIANCE ON THE *PROGROWTH* CASE IS MISPLACED ........... 44

I. THE *DURBIN* CASE REMAINS GOOD LAW ....................................... 46

Conclusion ..................................................................................................... 52

2

# **TABLE OF AUTHORITIES**

<u>**Page**</u>

## <u>Statutes and Legislative History</u>

11 U.S.C. §101 ............................................................... 18

11 U.S.C. §502 ................................................................. 6

11 U.S.C. §542 ................................................................. 6

11 U.S.C. §544 ............................................... 6, 16, 18, 19

11 U.S.C. §547 ...................................... 6, 10, 16, 17, 18, 20

11 U.S.C. §550 ................................................................. 6

11 U.S.C. §551 ................................................................. 6

28 U.S.C. §§151, 157 and 1334 ...................................... 6

28 U.S.C. §157(b)(2)(A),(F),(K) ..................................... 6

28 U.S.C. §158(a)(1) ........................................................ 7

28 U.S.C. §1409(a) .......................................................... 6

28 U.S.C. §1291, 1294 .................................................... 7

Fed. R. App. P. 4(a)(1)(A), 6 ......................................... 7

Fed. R. Bankr. P. 8002(a) ............................................... 7

U.C.C. §9-402 (former) ............................................ 23, 38

U.C.C. §9-101 ............................................................... 21

U.C.C. §9-102 ............................................................... 19

U.C.C. §9-203 ............................................................... 24

U.C.C. §9-317 ............................................................... 19

U.C.C. Article 9, §9-101 *et. seq.* ................................. 21

3

U.C.C. §9-108 ................................................................................. 25

U.C.C. §9-502 ................................................21, 22, 24, 27,28, 35, 38

U.C.C. §9-504 .................................................. 23, 24, 25, 38, 45

U.C.C. §9-506 .................................................. 22, 23, 27, 36, 37, 38

**Cases**

**Page**

*California Pump and Manufacturing Co., Inc.*,

    588 F.2d 717 (9th Cir. 1978) .................................................... 34

*CLC Equipment Company v. Brewer*, 139 F.3d 543 (5th Cir. 1998)..... 29, 30

*In re Door Supply Center, Inc.*, 3 B.R. 103 (Bankr. Idaho, 1980).............. 28

*Fernandez v. White Rose Food Co.*, 13 Misc.3d 1204(A),

    824 N.Y.S.2d 753 (S.Ct. Bronx Cty. 2006).............................................. 22

*First Community Bank of East Tennessee v. Jones*, 388 B.R. 317,

    325 (Bankr. E.D. Tenn. 2008) ........................................................ 39, 43

In *re Freeman*, 33 B.R. 234 (Bankr. C.D. Cal., 1983) ................................ 33

*Grabowski v. Deere & Co.*, 277 B.R. 388 (Bankr. S.D. Ill. 2002).............. 32

*In re I.A. Durbin, Inc.*, 46 B.R. 595 (Bankr. S.D. Fla. 1985).... 46, 47, 48, 49

*John Oliver Co., Inc. v. Baybank Merrimack Valley, N.A.*,

    91 B.R. 643 (Bankr. D. N.H. 1988)........................................................ 28

*John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 389

    (Bankr. S.D. Fla. 2007)......................................................... 41, 43

*LDB Media, LLC v. Gravitas Leasing, LLC*, 497 B.R. 332

    (Bankr. M.D. Fla. 2013)......................................................... 28

*Lucas v. Dynegy, Inc.*, 770 F.3d 1074, 1067-68 (2d. Cir. 2014) ....................9

*Mitsui Machinery Distribution, Inc. v. Chase Manhattan Leasing, Co.,*
    1994 Tex. App. LEXIS 3097 (Ct. App. Tex. 1994) ............................... 28

*Musso v. Tanya Ostashko,* 468 F.3d 99, 105 (2nd. Cir 2006) ...................... 19

*Pankratz Implement Co. v. Citizens Nat'l Bank,* 281 Kan. 209, 227,
    130 P.3d 57, 68 (Kan. 2006) ............................................................... 43

*ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.,* 558 F.3d 809
    (8th cir. 2009) ......................................................... 36, 37, 40, 44, 45, 46

*Rameker v. Farmers State Bank,* 313 B.R. 798
    (Bankr. W.D. Wis. 2004) ...................................................................... 22

*Ring v. First Niagara Bank, N.A.* 519 B.R. 586
    (Bankr. W.D.N.Y. 2014) .................................................................    10

*Ring v. First Niagara Bank, N.A. (In re Sterling United, Inc.),*
    2015 U.S. Dist. LEXIS 159414; 88 U.C.C. Rep. Serv. 2d
    (Callaghan) 340 (W.D.N.Y. 2015) .............................................   10, 11

*SDIF L.P. v. Northern Beef Packers L.P.,* 2014 Bankr.
    LEXIS 977, 83 U.C.C. Rep. Serv. 2d 104 (Bankr. D. S.D. 2014) ....... 28

*In re Tepper Industries,* 74 B.R. 713 (BAP 9th Cir. 1987) .......................... 34

*In re The Holladay House, Inc.,* 387 B.R. 689 (Bankr. E.D. Va. 2008),
    *affirmed,* 2008 U.S. Dist. LEXIS 84405 (E.D. Va. 2008) ........... 29, 50, 51

## Treatises and other Authorities

*Collier on Bankruptcy,* 16th Edition, P. 544.03 ........................................... 19

## JURISDICTIONAL STATEMENT

This appeal arises from an adversary proceeding associated with a case filed under Chapter 11 of Title 11 of the United States Code. Jurisdiction of the Title 11 case is proper pursuant to 28 U.S.C. §§151, 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A),(F),(K). Venue in the Western District of New York is proper pursuant to 28 U.S.C. §1409(a).

The adversary proceeding was brought by John H. Ring, III, Chapter 7 Trustee (the "Trustee") in the Chapter 7 bankruptcy case of Sterling United, Inc. (the "Debtor") against First Niagara Bank, N.A. ("First Niagara"), pursuant to 11 U.S.C. §§ 502, 542, 544, 547, 550 and 551.

Specifically, the Trustee appeals from the final Decision and Order of the U.S District Court, Western District of New York, Hon. William M. Skretny, U.S.D.J. dated November 24, 2015 (the "District Court"), which affirmed the Decision and Order of the U.S. Bankruptcy Court, Western District of New York, Hon. Michael J. Kaplan, U.S.B.J. (the "Bankruptcy Court"), dated October 3, 2014 which denied the Trustee's Cross-Motion for Summary Judgment and granted First Niagara's Motion for Judgment on the Pleadings.

On October 24, 2014, the Bankruptcy Court confirmed that its Decision and Order constituted a final appealable Order and confirmed that the Trustee's appeal

may proceed as of right. The District Court had jurisdiction over the appeal from the Bankruptcy Court pursuant to 28 U.S.C. §158(a)(1), following the timely filing of a Notice of Appeal from the Bankruptcy Court's Decision and Order on October 16, 2014, within fourteen (14) days after entry in accordance with Fed. R. Bankr. P. 8002(a).

The Trustee filed a Notice of Appeal on December 23, 2015, which was timely filed within thirty (30) days after entry of said District Court Decision and Order in accordance with Fed. R. App. P. 4(a)(1)(A), 6. The United States Court of Appeals for the Second Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. §§1291, 1294.

## STATEMENT OF THE ISSUES PRESENTED AND
## STANDARD OF REVIEW

1.  Whether or not, as a matter of law, certain UCC Financing Statements filed by Defendant/ Appellee First Niagara Bank ("First Niagara") on December 2, 2005, May 4, 2006, July 17, 2007, and October 19, 2012, perfected a blanket security interest in favor of First Niagara, with respect to the assets of Sterling United, Inc. (the "Debtor"), as against Plaintiff/Appellant John H. Ring, III, the Chapter 7 trustee (the "Trustee"), as a hypothetical lien creditor, none of which assets were located at or related to the operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York as of the bankruptcy petition date or within the ninety (90) day preference period prior thereto.

2.  Whether or not, as a matter of law, the subject UCC Financing Statements perfected a blanket security interest in favor of First Niagara with respect to any assets of the Debtor, as against the Trustee as a hypothetical lien creditor, that were previously located at or relating to the operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York and later moved from said premises.

3.  If it is determined that First Niagara did not have a perfected blanket security interest in assets not located at said premises and it is determined that First Niagara continued to possess a blanket security interest in assets that were formerly

8

located at said premises and moved, there are material factual issues as to what assets were formerly located at said premises.

4.      Whether or not there are any material issues of fact relating to the sufficiency of the collateral description contained in the subject UCC Financing Statements, the circumstances surrounding the preparation of the subject UCC Financing Statements or any other factual issues.

This Court's review of the Decisions and Orders of the District Court and Bankruptcy Court is plenary. Legal decisions are reviewed *de novo* and factual findings for clear error. *Lucas v. Dynegy, Inc.,* 770 F.3d 1074, 1067-68 (2d. Cir. 2014). The Decisions and Orders appealed from involve questions of law.

## STATEMENT OF CASE

The Trustee commenced this action by filing a Complaint on March 20, 2014. (A-17–A-36) The Trustee seeks, *inter alia,* to recover certain transfers of monies and property made by the Debtor to or on behalf of First Niagara during the ninety (90) day preference period provided by 11 U.S.C. §547, as well as after Petition Date. The Trustee alleges that First Niagara did not have a perfected security interest in the property subject of such transfers as a result of deficient collateral descriptions contained in certain U.C.C. financing statements filed by First Niagara.

First Niagara filed an Answer on April 23, 2014. (A-179–A-200) Following its Answer, First Niagara filed a Motion for Judgment on the Pleadings. (A-37–A-144) The Trustee filed a Cross-Motion for Summary Judgment. (A-145–A-247) The Bankruptcy Court, by Decision and Order of Hon. Michael J. Kaplan, U.S.B.J., dated October 3, 2014, denied the Trustee's cross-motion and granted First Niagara's motion dismissing the Complaint. *Ring v. First Niagara Bank, N.A. (In re Sterling United, Inc.),* 519 B.R. 586 (Bankr. W.D.N.Y. 2014) (A-1–A-6). The District Court affirmed by Decision and Order of Hon. William M. Skretny, U.S.D.J., dated November 24, 2015. *Ring v. First Niagara Bank, N.A. (In re Sterling United, Inc.),* 2015 U.S. Dist. LEXIS 159414; 88 U.C.C. Rep. Serv. 2d (Callaghan) 340 (W.D.N.Y. 2015) (A-7–A-9).

10

On May 17, 2013 (the "Petition Date"), certain petitioning creditors filed an involuntary Chapter 7 Petition against the Debtor. On June 1, an Order for relief under Chapter 7 was granted and entered. On June 20, 2013, the Trustee was appointed interim Chapter 7 trustee of the Debtor's bankruptcy estate. On July 1, 2013, First Niagara filed a motion for relief from the automatic stay asserting that it had a perfected blanket security interest in all of the assets of the Debtor. On July 18, 2013, the Trustee filed an Objection to the stay relief motion advising the Bankruptcy Court of the existence of avoidance claims against First Niagara under Chapter 5 of the Bankruptcy Code. On July 24, 2013, the Bankruptcy Court granted stay relief to First Niagara, without prejudice, to the Trustee's avoiding powers. (A-20–21; A-150)

First Niagara filed three (3) sets of three (3) Financing Statements naming the Debtor as set forth below:

First Set:  Original Filings

a) Filing Date: 12/2/05, Filing Number:  200512021278427
b) Filing Date: 5/4/06, Filing Number:  200605040381527
c) Filing Date: 7/17/07, Filing Number:  200707170585964

(collectively referred to herein as the "FNB UCC Filings")

 (A-21–A-22; A-192–A-194)

11

Second Set:  Address Amendments
  a) Filing Date: 10/19/12, Filing Number:  201210196174125
  b) Filing Date: 10/19/12, Filing Number:  201210196174062
  c) Filing Date: 10/19/12, Filing Number:  201210196174086

(collectively referred to herein as the "FNB UCC Address Amendments")

(A-22; A-195–A-197)

Third Set:    Collateral Amendments

  a)  Filing Date: 2/19/13, Filing Number:  201302195189120
  b)  Filing Date: 2/19/13, Filing Number:  201302195189081
  c)  Filing Date: 2/19/13, Filing Number:  201302195189156

(collectively referred to herein as the "FNB UCC Collateral Amendments)

(A-22–A-23; A-198–A-200)


The FNB UCC Filings contain the following description of collateral:

> All assets of the Debtor including, but not limited to, any
> and all equipment, fixtures, inventory, accounts, chattel
> paper, documents, instruments, investment property,
> general intangibles, letter of credit rights, and deposit
> accounts now owned and hereafter acquired by Debtor
> **and located at or relating to the operation of the
> premises at 100 River Rock Drive, Suite 304, Buffalo,
> New York, together with any products and proceeds
> thereof … .**

(A-21–A-22; A-192–A-194) (emphasis supplied)

12

At some time prior to October 19, 2012, the Debtor moved its business operations to 6030 North Bailey Avenue, Amherst, New York 14226 and no longer owned property or operated any business out of the premises at 100 River Rock Drive, Suite 301, Buffalo, New York. (A-23–A-24; A-154) The FNB UCC Address Amendments, amended the FNB UCC Filings to change the name and address of the Debtor to Sterling United, Inc., 6030 North Bailey Avenue, Amherst, New York 14226; however, there was no change to the collateral description. (A-22; A-195–A-197)

On February 19, 2013, First Niagara filed the FNB UCC Collateral Amendments, amending the collateral description set forth on the FNB UCC Filings to read:

> All assets of the Debtor including, but not limited to, any and all equipment, fixtures, inventory, accounts, chattel paper, documents, instruments, investment property, general intangibles, letter of credit rights, deposit accounts now owned or hereinafter acquired by Debtor, **including but not limited to, those located at or used in connection with the business premises located at 6030 N. Bailey Avenue, Amherst, NY 14226, together with any and all products and proceeds thereof.**
>
> (A-22–A-23; A-198–A-200) (emphasis supplied)

The FNB UCC Collateral Amendments were filed during the ninety (90) preference period prior to the Petition Date, shortly before the Debtor ceased business operations and at a time when First Niagara began its pre-petition liquidation of the Debtor's assets. (A-20; A-22; A-24; A-150; A-153)

During the preference period, it is evident that the Debtor conducted an auction generating approximately $362,003.26 in proceeds which were paid to First Niagara. The Debtor in its bankruptcy filing stated that a total amount of $450,000.00 was paid to First Niagara during the preference period. After the Petition Date and prior to the Order for Relief, it is evident that the Debtor paid an additional $223,755.62 to First Niagara. Subsequent to those transfers, First Niagara stated in its stay relief motion that the Debtor was owed approximately $389,000 in accounts receivable of which approximately $250,000 was collectable. (A-24–A-25)

Rui Chaves, Ph.D reviewed the collateral description set forth in the FNB UCC Filings. Dr. Chaves holds a Ph.D. in Linguistics and is an Associate Professor in the Department of Linguistics at the University at Buffalo, SUNY. (A-201–A-202; A-209–A-216) Dr. Chaves concludes that the collateral description in the FNB UCC Filings is ambiguous from a linguistics standpoint, since both First Niagara's interpretation and the Trustee's interpretation of the language are plausible.

14

However, Dr. Chaves opines that many readers would not recognize the ambiguity and conclude the description means one thing or the other. Dr. Chaves states that readers not recognizing the linguistic ambiguity and interpreting the description contrary to the intention or interpretation of the drafter would be seriously misled. Dr. Chaves concludes that the collateral description is insufficient for its legal purpose of giving notice. (A-201–A-208)

John Gallo reviewed the collateral description set forth in the FNB UCC Filings. Mr. Gallo has approximately thirty (30) years experience in the financial and lending industry, including extensive experience in reviewing and drafting UCC Financing Statements. (A-217–A-218; A-222–A223) Mr. Gallo avers that the reference in the collateral description to a particular premises location is highly unusual and that in his experience he has not seen any such reference in any UCC Financing Statements he has reviewed. He concludes that the collateral description by its terms describes and identifies only assets located or relating to the premises described and, to the extent it was intended to describe all assets wherever located, the actual language would mislead a financial professional to conclude that the collateral was so limited. (A-217–A-221)

15

**ARGUMENT**

## FIRST NIAGARA BANK DOES NOT HOLD AN UNLIMITED BLANKET SECURITY INTEREST HAVING PRIORITY OVER THE TRUSTEE'S CHAPTER 5 AVOIDANCE AND STONG ARM POWERS

### A. FINANCING STATEMENTS FILED BY FIRST NIAGARA ON FEBRUARY 19, 2013 DURING THE PREFERENCE PERIOD ARE LEGALLY INEFFECTIVE TO PERFECT A BLANKET SECURITY INTEREST

First Niagara has not challenged, nor raised any issue with respect to: (1) the Trustee's authority under 11 U.S.C. §547 to avoid any security interest perfected by the FNB UCC Collateral Amendments filed on February 19, 2013; or (2) the Trustee's status as a hypothetical lien creditor under 11 U.S.C. §544 giving him lien priority over First Niagara's security interest if such security interest is determined to be unperfected prior to the filing of the FNB UCC Collateral Amendments. On the other hand, the Trustee does not raise any issue with respect to or challenge that, by reason of the security agreements, First Niagara has a blanket security interest in the assets of the Debtor (albeit unperfected).

The issue is simply whether First Niagara's blanket security interest is perfected. If not, any payments to First Niagara and/or transfers of property to First Niagara, by or on behalf of the Debtor during the ninety (90) day period prior to the petition date, are avoidable preferences pursuant to 11 U.S.C. §547. It is

16

instructive to briefly review the applicable statutes to show that these potential threshold issues are not in dispute.

First Niagara filed its FNB UCC Collateral Amendments on February 19, 2013, while First Niagara was vigorously liquidating the Debtor's collateral (and presumably reviewing its legal filings in light of the prospect of a bankruptcy filing by the Debtor.) The Trustee does not dispute that the FNB UCC Collateral Amendments would have been more than are sufficient to perfect an unlimited blanket security interest in all assets of the Debtor but for the bankruptcy filing. However, the FNB UCC Collateral Amendments were filed within the 11 U.S.C. §547 ninety (90) day preference period. Although First Niagara maintains that the original FNB UCC Filings were sufficient to perfect a blanket, unlimited security interest, First Niagara claims that it was merely taking a "belt and suspenders' approach" in filing the FNB UCC Collateral Amendments. Putting aside the reasonable inference that may be drawn that First Niagara expressly recognized that its original FNB UCC Filings were defective and seriously jeopardized perfection, the FNB Collateral Amendments are in any event legally ineffective to create any rights.

The FNB Collateral Amendments were filed during the ninety (90) day 11 U.S.C. §547 preference period. If First Niagara was unperfected prior to the

17

preference period, any perfection arising from the FNB Collateral Amendments is voidable as a preference. If First Niagara were perfected prior to the preference period, the FNB Collateral Amendments are superfluous. Pursuant to 11 U.S.C. §547, the Trustee may avoid certain transfers of property made within the ninety (90) day period prior to the petition date. The filing of the FNB Collateral Amendments satisfy all of the elements of a voidable preferential transfer. A "transfer" includes the creation of a lien. 11 U.S.C. §101(54)(A). Moreover, any perfected lien arising from the filing was for First Niagara's benefit, on account of an antecedent debt owed by the Debtor, made while the Debtor was insolvent, allowing First Niagara to recover more than it would have due to the Trustee's authority pursuant to 11 U.S.C. §544.

The Trustee's status as a hypothetical lien creditor and the effect of that status on an unperfected security interest has also not been disputed by First Niagara. Pursuant to 11 USC §544(a):

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the Trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by – (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien,

18

> whether or not such a creditor exists; (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such creditor exists.

As explained by this Court, "[s]ection 544(a)(1) thus puts the trustee in the position of an ideal lien creditor, armed with a judgment and with all the power that state law confers on such ideal creditors." *Musso v. Tanya Ostashko,* 468 F.3d 99, 105 (2nd. Cir 2006). Under the authority of 11 U.S.C. §544, a trustee in bankruptcy has priority over an unperfected security interest since pursuant to NY U.C.C. §9-317 an unperfected security interest is subordinate to the rights of "a person that becomes a lien creditor before . . . the security interest . . . is perfected." As discussed in *Collier on Bankruptcy,* 16th Edition, P. 544.03:

> If the holder of a security interest in the debtor's property has not taken the necessary steps under applicable law to put other potential creditors on notice of its interest by proper perfection, §9-317(a)(2) of the Uniform Commercial Code, provides that such a security interest is subordinate to the right of a 'lien creditor.' In addition to the trustee's status as a 'judicial lien creditor' under the Bankruptcy Code, the U.C.C provides that the bankruptcy trustee from the date of filing the petition is a 'lien creditor' [U.C.C. 9-102(a)(52)(C)]. Given this status, the bankruptcy trustee may use the strong arm clause to avoid unperfected security interests in personal property subject to Article 9 of the U.C.C., as well as to avoid unperfected liens and security interests in real property or personal

19

property to the extent that a judgment lien creditor may
do so under applicable non-bankruptcy law.
(Footnote citations omitted).

This road of well-settled law takes us to the ultimate legal issue for determination

on this Appeal.

## B. THE TRUSTEE'S RECOVERY CLAIMS RELATE TO THE PREFERENCE AND POST-PETITION PERIOD

In the instant proceeding, the issue is whether the original FNB UCC Filings

were sufficient to properly perfect an unlimited blanket security interest in the

property of the Debtor. The Trustee maintains that the original FNB UCC filings

were not effective to perfect First Niagara's blanket security interest and, as a

result, the Trustee is entitled to recover any payments and/or property transferred

by the Debtor to or for the benefit of First Niagara, in which First Niagara was

unperfected, during the 11 U.S.C. §547 ninety (90) day preference period and

subsequent to the Petition Date.

The Trustee has at no time challenged or raised any issue with respect to

First Niagara's status as a bona fide creditor holding a valid claim against the

Debtor and a valid blanket security interest pursuant to the security agreements

(albeit unperfected). The issue is one of perfection and priority, not whether First

20

Niagara was entitled to collect on its indebtedness prior to the Petition Date.

## C. APPLICABLE PROVISIONS OF REVISED ARTICLE 9
## OF THE UNIFORM COMMERCIAL CODE

On July 1, 2001, New York adopted the revised version of Article 9 of the Uniform Commercial Code. *See* U.C.C. Article 9, §§9-101 *et seq.* The first of the FNB UCC Filings was made on December 2, 2005, more than four (4) years after the revised code was adopted. There is no question that the determination of the sufficiency of the FNB UCC Filings for purposes of perfection is to be based exclusively on the revised code and against the statutory backdrop of the revised code. Pursuant to U.C.C. §9-502:

> a financing statement is sufficient **only if it**: (1) provides the name of the debtor; (2) provides the name of the secured party or a representative of the secured party; (3) **indicates the collateral covered by the financing statement.**
> (emphasis supplied)

The Official Comment to said section explains that the section adopts the system of "notice filing" within which the "[t]he notice itself indicates merely that a person may have a security interest **in the collateral indicated**. Further inquiry from the parties concerned will be necessary to disclose the complete state of

21

affairs." U.C.C. §9-502, Official Comment (2) (emphasis supplied). However, notice that a person "may" have an interest in some type of collateral is not the same as notice that a person "may" have an interest in the collateral *indicated*. In other words, notice of a security interest in collateral does not obviate the need to indicate the collateral. *See e.g. Rameker v. Farmers State Bank*, 313 B.R. 798 (Bankr. W.D. Wis. 2004) (bank unperfected where collateral described as general business security agreement); *Fernandez v. White Rose Food Co.,* 13 Misc.3d 1204(A), 824 N.Y.S.2d 753 (S.Ct. Bronx Cty. 2006) (party unperfected where collateral described as certain specific grocery store and did not state all assets).

Errors or omissions in financing statements are addressed in U.C.C. §9-506 which provides:

> (a) Minor errors and omissions. A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, **unless the errors or omissions make the financing statement seriously misleading.**
> (b) Financing statement seriously misleading. Except as otherwise provided in subsection (c), a financing statement that fails sufficiently to provide the name of the debtor in accordance with Section 9-503(a) is seriously misleading.
> (c) Financing statement not seriously misleading. If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with Section 9-503(a), the name provided

22

> does not make the financing statement seriously misleading.
>> (emphasis supplied).

The comment to this revised code explains that subsections (b) and (c) are new and "designed to discourage the fanatical and impossibly refined reading of statutory requirements in which courts occasionally have indulged themselves." U.C.C. §9-506, Official Comment (2). The statutory policy to simplify formal requisites and filing requirements, as reflected in the revised code is material, relevant and applicable to the evaluation of the collateral description at issue in the instant matter and will be discussed more fully below.

Indication of collateral for purposes of a financing statement is addressed in U.C.C. §9-504 which provides:

> A financing statement sufficiently indicates the collateral it covers if the financing statement provides: (1) a description of the collateral pursuant to Section 9-108; or (2) an indication that the financing statement covers all assets or all personal property.

Prior to the revised code, secured creditors holding blanket security interests were not allowed to utilize the supergeneric collateral description of "all assets" or "all personal property;" instead, former section 9-402(1) required at a minimum a statement indicating the types or describing the items of collateral. *See* UCC §9-

504, Official Comment (2). Additionally, the revised code eliminated the requirement that the secured party obtain the debtor's signature on a UCC Financing Statement. *See* U.C.C. §9-502, Official Comment (3). As a result of the amendments constituting the revised code, secured creditors (so long as authorized by the security agreement) became free to unilaterally draft and file UCC Financing Statements without review or ratification by the debtor.

Additionally, blanket lien holders were free to use a simple, effective and straightforward collateral description of "all assets" or "all personal property." As explained in the Official Comment (2) to U.C.C. §9-504:

> Debtors sometimes create **a security interest in all, or substantially all, of their assets**. To accommodate this practice, paragraph (2) expands the class of sufficient collateral references to embrace 'an indication that the financing statement covers all assets or all personal property.' **If the property in question belongs to the debtor and is personal property, any searcher will know that the property is covered by the financing statement.** . . . Note that a broad statement of this kind (e.g., 'all debtor's personal property') would not be a sufficient 'description' for purposes of a security agreement. See Sections 9-203(b)(3)(A), 9-108.
> (emphasis supplied).

Against this statutory backdrop, it must be determined whether the collateral description in the original FNB UCC Filings is sufficient or seriously misleading.

24

In the Security Agreements between First Niagara and the Debtor, the collateral is defined and described as:

> The "Collateral" means collectively, ***wherever located***, whether now owned or hereafter acquired or now existing or hereafter arising or accruing . . . Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, General Intangibles . . . Instruments, Inventory, Investment Property, money and other goods and other personal property . . . Proceeds, other proceeds and Products [thereof].
> (A-56) (emphasis supplied)

The Trustee does not and has never disputed that the security agreement is more than sufficient to create a blanket security interest in favor of First Niagara in all property of the Debtor wherever located. Had First Niagara simply used the security agreement collateral description in its FNB UCC Filings, as provided in U.C.C. §§9-108, 9-504(1), the collateral would be properly and sufficiently indicated.

However, in the FNB UCC Filings, First Niagara chose not to use the actual description of its collateral contained in its security agreements, nor did it use the simple description of "all assets" or "all personal property" as provided by U.C.C. §9-504(2). Either of these formulations would be sufficient as a matter of law. Instead, First Niagara chose to use, as the Bankruptcy Court termed "a needlessly convoluted description of collateral." The FNB UCC Filings prepared and filed

25

by First Niagara indicate the collateral as being:

> All assets of the Debtor including, but not limited to, any and all equipment, fixtures, inventory, accounts, chattel paper, documents, instruments, investment property, general intangibles, letter of credit rights, and deposit accounts now owned and hereafter acquired by Debtor *and located at or relating to the operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York*, together with any products and proceeds thereof ....
> (emphasis supplied).

Wholly absent is the language "wherever located" and in its place is an indication that the collateral consists of "[a]ll assets . . . located at or relating to the operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York." The Trustee maintains that the collateral description is sufficient only to give notice and a duty to inquire as to a security interest, and thus perfection in, only those assets "located at or relating to . . . 100 River Rock." The clause "and located . . ." naturally modifies "All assets." First Niagara maintains that everything that follows "All Assets" is simply included in the term "All Assets" and that the reference to the property address is simply informational.

The reference to address is not simply informational, but rather, is a limitation on the perfection of First Niagara's security interest. Perfection fails on the ground of sufficiency in that it fails to identify collateral other than that related to 100 River

26

Rock. Even if the collateral description were to be deemed *sufficient* in that it *identifies* the collateral being "all assets", it nonetheless fails because the description is seriously misleading. As recognized by the District Court, it is a two step inquiry: First, does the description indicate the collateral; if not the financing statement fails for insufficiency pursuant to U.C.C. §9-502(a)(3). Second, even if sufficient to indicate the collateral, is the collateral description seriously misleading and, if so, the financing statement fails to perfect a security interest under U.C.C. §9-506(a).

### D. THE FNB UCC FILINGS DO NOT SUFFICIENTLY INDICATE COLLATERAL AND FAIL FOR PERFECTION PURPOSES PURSUANT TO U.C.C. §9-502(a)(3)

The Trustee maintains that the collateral description fails to indicate collateral other than as related to 100 River Rock, and thus, the collateral description does not satisfy the requirements of U.C.C. §9-502(a)(3). The mere filing of a financing statement is insufficient to indicate collateral. Secured creditors have contended that financing statements containing certain ambiguous collateral descriptions or collateral descriptions that clearly omit certain collateral, nonetheless are sufficient to serve the notice function of Article 9 that "a person may have a security interest" such that "further inquiry" "will be necessary to

27

disclose the complete state of affairs" pointing to Official Comment (2) to U.C.C. §9-502.

Courts have rejected this contention. The full text of said Official Comment states that the requisite notice is one that "a person may have a security interest *in the collateral indicated*." *Id.* (emphasis supplied). If the financing statement collateral description fails to sufficiently indicate the collateral, perfection fails as to the collateral not indicated. *See e.g. SDIF L.P. v. Northern Beef Packers L.P.,* 2014 Bankr. LEXIS 977, 83 U.C.C. Rep. Serv. 2d 104 (Bankr. D. S.D. 2014) (amended financing statement narrowed collateral description and limited perfection); *LDB Media, LLC v. Gravitas Leasing, LLC,* 497 B.R. 332 (Bankr. M.D. Fla. 2013) (despite reference to equipment and vehicles, financing statement failed to identify equipment in vehicles); *Mitsui Machinery Distribution, Inc. v. Chase Manhattan Leasing, Co.,* 1994 Tex. App. LEXIS 3097 (Ct. App. Tex. 1994) (despite broad interpretation urged by secured creditor, perfection limited to collateral description as interpreted by court); *John Oliver Co., Inc. v. Baybank Merrimack Valley, N.A.,* 91 B.R. 643 (Bankr. D. N.H. 1988) (despite inclusion of the words "equipment, inventory, goods" in financing statement, collateral description did not constitute indication of those types of collateral).

28

In *In re Door Supply Center, Inc.,* 3 B.R. 103 (Bankr. Idaho, 1980), the

Court held that:

> The defendant perfected its security interest only in those
> items of collateral described in the financing statement. A
> financing statement, if more limited in scope than the
> security agreement which it perfects, limits the collateral in
> which the creditor has a perfected security interest to that
> description, as against third party creditors and a trustee in
> bankruptcy.
> 3 B.R. at 105.

As more recently recognized by the Court in *In re The Holladay House, Inc.,* 387

B.R. 689 (Bankr. E.D. Va. 2008), *affirmed*, 2008 U.S. Dist. LEXIS 84405 (E.D.

Va. 2008):

> A financing statement, more limited in scope than the
> security agreement which it perfects, limits the collateral in
> which the creditor has a perfected interest to that described
> in the financing statement, as against third party creditors
> and a trustee in bankruptcy. The presence of qualifying
> language in a financing statement functions to limit the
> scope of perfection of the secured creditor's security
> interest.
> 387 B.R. at 695 (Citations omitted).

Where collateral is not sufficiently indicated in a financing statement, reasonable

inquiry does not include looking at the security agreement. This notion was

rejected by the Fifth Circuit in *CLC Equipment Company v. Brewer,* 139 F.3d 543

(5th Cir. 1998) in a case involving a limited collateral description, wherein the

29

Court observed that:

> CLC drafted the financing statement and chose to
> describe the collateral in more detail than was required.
> CLC's narrow description excluded the Site Leases and
> the revenues and proceeds from the Site leases from its
> coverage. CLC must live with the consequences of the
> collateral description it drafted.
> 139 F.3d at 546, f.n. 5.

Likewise, where a secured creditor, such as First Niagara, chooses to describe its

collateral as being tied to a specific location, rather than all locations or not stating

any reference to location at all, it is perfected only in the property as so described.

The Trustee submitted the Declaration of John Gallo in connection with the

subject motions. Mr. Gallo has thirty (30) years experience in the banking,

finance and lending industry whose duties have included the preparing and filing

UCC Financing Statements and reviewing UCC Financing Statements in

connection with loan applications, collections and participation in bankruptcy

proceedings as a secured creditor. In reviewing numerous "blanket" UCC

Financing Statements, Mr. Gallo has not ever seen a collateral description

identifying a specific location. Mr. Gallo avers that the original FNB UCC Filings

do not describe collateral at other than the 100 River Rock Drive location.

Since there is no requirement to set forth a location in a collateral

description, the reference to location must have some meaning. This is especially

so when on reviews the FNB Address Amendments which changed the name of the Debtor and the address of the Debtor in the address block, but left the location specific collateral description intact.

The District Court, in determining that FNB UCC Filings indicated the collateral as being all assets without limitation, concluded that the Trustee's interpretation of the collateral description "would require ignoring the 'including, but not limited to' language." However, the District Court's conclusion of collateral indication ignores that the "including, but not limited to" language merely describes the categories of assets that are "located at or relating to the operation of the premises . . . ". A non-exhaustive list of assets can still be, and was, limited to a particular location.

The Bankruptcy Court engaged in a paraphrasing exercise that the Trustee would submit is simply not reasonable. There is absolutely no requirement under U.C.C. Article 9 to identify a particular premises in a financing statement collateral description. It is readily apparent that location references in a financing statement collateral description, especially where the security agreement has no such location reference or limitation, is virtually unheard of. The address of a debtor is listed in a separate area on the financing statement. The presence of the address in the collateral description utilized by First Niagara in these particular

31

financing statements would naturally lead a reader to conclude that the address has significance in its relationship to the collateral, as opposed to merely stating where the collateral is located. Location of the collateral can be gleaned from the address block, especially where the two addresses are identical. This is especially so where the FNB Address Amendments change the address of the Debtor in the address block but does not change the collateral description location reference.

In *Grabowski v. Deere & Co.,* 277 B.R. 388 (Bankr. S.D. Ill. 2002), the party challenging perfection argued that it was misled by the address set forth in the address block of the financing statement (an address where the collateral was not maintained). The Court emphasized that the:

> address was not part of the Bank's ***description of its collateral and, thus, did not serve to limit the collateral*** subject to the Bank's lien as South Pointe argues. In fact, Bank of America's financing statement indicated the Bank had a lien on the debtors' 'equipment,' ***with no indication that its interest was confined to equipment located in a particular place.***
> 277 B.R. at 392 (emphasis supplied).

However, here, First Niagara did in fact include the address in its collateral description and did in fact indicate that its interest was confined to assets located at that particular place.

32

An intent to show an unlimited blanket security interest at all locations could have been easily accomplished by utilizing the two words in the security agreement, *i.e.,* "wherever located." There are any number of combinations of words, phrases and language that could have been used to describe collateral at other locations, including "all locations" or "wherever used in the business of the Debtor." In fact, First Niagara need not have mentioned any reference to location at all. Instead, First Niagara's election to make particular reference to one location, together with language that can clearly be paraphrased as "all assets . . . located at 100 River Rock Drive" is at a minimum seriously misleading, if not a failure to identify collateral outside that limitation.

### E.  LOCATION LIMITATIONS ON SECURITY INTEREST PERFECTION HAVE BEEN ENFORCED

Courts have limited perfection of security interests based on location limitations contained in collateral descriptions. For example, the financing statement and security agreement at issue in *In re Freeman,* 33 B.R. 234 (Bankr. C.D. Cal., 1983) contained the following language which referenced a specific location:

> All furniture and fixtures and inventory of the gold chain Supermarkets now or at any time located or installed on the land or in the improvements at 813 State Street, Santa Barbara, California.       33B.R. at 234.

33

The debtor thereafter moved to a new location. The *Freeman* Court held that:

> the abandonment of the location specified in the security agreement and the subsequent liquidation of the inventory transferred from that location, extinguished any security interest which the bank may have had. Collateral securing the obligation was specifically limited to furniture, fixtures and inventory located at 813 State Street, Santa Barbara. The financing statement and security agreement contained narrow and specific description of collateral securing this obligation. * * * Only those items located at that location gave rise to the security interest.
> 33 B.R. at 235.

In *In Re Tepper Industries,* 74 B.R. 713 (BAP 9th Cir. 1987), the Court affirmed a determination that a location specific security interest "was no longer valid because of (1) Tepper's subsequent moves to other locations, (2) the turnover in Tepper's inventory and equipment, and (3) Charter's failure to file a new or amended financing statement." 74 B.R. at 715. "The cases are clear that the description of the collateral may have the effect of restricting the security interest created in the security agreement." *Id.* In *California Pump and Manufacturing Co., Inc.,* 588 F.2d 717 (9th Cir. 1978), the financing statement described the collateral as: "All furniture, fixtures, equipment, inventory and accounts receivable owned by Debtor and located at 436 Rozzi Place, South San Francisco, California 94080." The *California Pump Court* held that the "description limited to property

34

situated in South San Francisco does not 'reasonably identify' property actually located in Fresno or Hayward" thereby limiting perfection to the specified location. 588 F.2d at 719.

As the above cited cases illustrate, a financing statement (or security agreement) limited to location will not operate to create or perfect a security interest in property at some other location. In the instant case, at some time prior to October 19, 2012, the date First Niagara filed the FNB Address Amendments, the Debtor moved its business to a new location, i.e., 6030 N. Bailey Avenue, Amherst, NY 14226. The Debtor remained at this new location through the date of filing of the legally ineffective FNB Collateral Amendments and the Petition Date. It was at the new location that First Niagara was in the process of liquidating Debtor's assets when the involuntary bankruptcy petition was filed.

It is submitted that the collateral description language in the FNB UCC Filings fails to indicate collateral other than as limited to 100 River Rock Drive. As such, perfection is limited due to the failure to satisfy the requirements of U.C.C. §9-502(a)(3). Not only do the FNB UCC Filings fail to indicate collateral as all assets of the Debtor, even if this Court were to conclude that the original FNB UCC Filings do in fact indicate collateral other than that relating to 100 River Rock Drive, the FNB UCC Filings are nonetheless seriously misleading

35

pursuant to U.C.C. §9-506 and perfection is limited to the location stated.

## F. THE LINGUISTIC AMBIGUITY IN THE COLLATERAL DESCRIPTION WOULD NOT BE RECOGNIZED BY SOME READERS RENDERING IT SERIOUSLY MISLEADING

The Trustee presented the Declaration of Rui Chaves, Ph.D, an Associate Professor in the Department of Linguistics, University of Buffalo, SUNY and the holder of a Ph.D in Linguistics. Dr. Chaves states that from a linguistics standpoint, the interpretations of the Trustee and First Niagara are both plausible and linguistically reasonable. Both the Bankruptcy Court and the District Court disregard the serious import of the linguistic ambiguity. Both the Bankruptcy Court and the District Court more or less summarily conclude that the simple existence of a linguistic ambiguity is determinative under the "notice filing" system citing the *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.,* 558 F.3d 809 (8th cir. 2009) case which is discussed in detail below. Ignored is the serious import and effect of the linguistic ambiguity -- that it is likely that a body of readers that will interpret the collateral description one way or the other, while not recognizing that an ambiguity even exists.

36

Dr. Chaves correctly observes that "the purpose and context of the collateral description sentence is to provide a clearly understood legal notice." Dr. Chaves instructs that it is not reasonable to assume that all, or even most, readers will recognize the ambiguity, such that reader will read and interpret the sentence one way or the other. He states that "[r]eaders who interpret the sentence contrary to the intent of the writer will be seriously mislead. As such, the sentence is misleading, since different readers are likely to arrive at different interpretations." Dr. Chaves opines that the collateral description is "unacceptable" and "inadequate" for its intended purpose of describing collateral. Of course, Dr. Chaves is not applying any particular legal standard when rendering his opinion, but his insights are very relevant and material to the articulation of an appropriate legal standard.

### G.  THE PURPOSES, POLICY AND INTENT OF REVISED ARTICLE NINE MUST BE INCORPORATED INTO THE LEGAL STANDARD FOR DETERMINING A SERIOUSLY MISLEADING FINANCING STATEMENT

The general policy of Article 9 notice filing is "to simplify formal requisites and filing requirements." *See* U.C.C. §9-506, Official Comment (2). As discussed above, the revisions to Article 9 were designed to further these policy purposes, include the elimination of a debtor's signature on a financing statement and the

37

statutory provision that a blanket security interest holder may simply describe collateral as being "all assets" or "all personal property." *See* U.C.C. §§ 9-502, 9-504. Moreover, they include, for the first time, a statutory standard for determining whether a financial statement is seriously misleading with respect to a debtor's name. U.C.C. §9-506(b),(c). The revisions were "designed to discourage the fanatical and impossibly refined reading of statutory requirements in which courts occasionally have indulged themselves." U.C.C. §9-506, Official Comment (2).

Use of the "seriously misleading" standard for "minor errors or omissions" in collateral description for financing statements has not changed (U.C.C. §9-506, former Section 9-402(8)), but what has changed is the expression in the revised code of the legislative intent for purposes of interpreting what is meant by the phrase "seriously misleading." The code revisions make clear that the drafters and the legislature believed that a secured party should be under a greater burden to avoid routine and unnecessary mistakes, errors and omissions, which are fully within their province to easily avoid.

The prior statute did not define when or under what circumstances a financing statement with minor errors was "seriously misleading" in incorrect name cases. "As a result, courts disagreed over whether to adopt a bright-line rule

that gave clear guidance or one that allowed fact-intensive inquiry in the interest of equity and fairness.  The majority of courts . . . chose the latter course, employing a 'reasonably diligent searcher' standard whereby the reviewing court determined on a case-by-case basis whether a reasonable search by a diligent creditor would have disclosed the non-conforming financing statement despite the incorrect debtor's name." *First Community Bank of East Tennessee v. Jones,* 388 B.R. 317, 325 (Bankr. E.D. Tenn. 2008).  "This standard often led to contradictory results." *Id.*

The legal standard simply and summarily propounded by both the lower courts in this case is that where a financing statement collateral description can reasonably be interpreted both in a way to include the collateral and not to include the collateral is sufficient because it will lead to further inquiry, citing *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.,* 558 F.3d 809 (8th cir. 2009) (discussed in detail below).  In collateral description sufficiency cases, and in particular this one, such a standard is insufficient and incapable of serving the purposes of "notice filing."  Such a standard fails to recognize that some searchers, especially given the language in the subject financing statements at issue here, will not make further inquiry because they will not recognize the ambiguity and conclude the language simply means one thing or another.  In other words, the collateral

39

description can reasonably be interpreted to forestall further inquiry by a certain portion of searchers.

Prior to the revised code, many courts developed the "reasonably diligent" searcher standard in erroneous debtor name cases. The problems arising in the erroneous debtor name cases were expressly addressed in the revised code. Prior to the revised code, the courts had developed either a bright line or reasonably diligent searcher standard. The *ProGrowth* standard used by the courts below in this case appears to be in some respects similar to the reasonably diligent searcher standard developed in the "debtor name" cases, namely, the assumption that the actual collateral described in the security agreement will be discovered upon further inquiry where someone could interpret it to include certain collateral, as compared to the goal of determining whether a diligent searcher would locate a misnamed debtor financing statement in order to learn of its existence.

However, the standard used by the lower courts in this case is misplaced for at least two reasons. First, the standard does not operate the same in both contexts and second, the standard does not comport with the policies and objectives of the policies and legislative intent expressed in the revised code provisions. The "reasonable diligent searcher" standard required "the reviewing court to determine on a case-by-case basis, whether a hypothetical reasonable searcher would have

40

been able to discover the non-conforming financing statement despite the error in a debtor's name." *John's Bean Farm of Homestead, Inc.,* 378 B.R. 385, 389 (Bankr. S.D. Fla. 2007). "This standard created extensive litigation and fragmented or contradictory decisions." *Id.* It is apparent that this standard was designed to result in a rule where all incorrectly named financing statements would be found, so long as a reasonably diligent searcher was used. In other words, a reasonably diligent searcher would never fail to find the incorrectly named financing statement.

In the case of misleading collateral descriptions, the standard does not translate. Can it reasonably be concluded that all searchers would interpret the collateral description here in the same way? There are accepted objective methods for conducting name searches so that it is reasonable to establish a standard that is designed to insure that all missing financing statements are located if those methods are utilized. However, there are no accepted objective methods for determining an individual's interpretation ambiguous English language. As recognized by Dr. Chaves:

> Different speakers of the same language have different biases and preferences about how to process language, including ambiguous sentences, especially if a sentence if very complex. Such individual preferences often depend on their age, their background, as well as, subconscious and conscious biases. Theses preferences

41

> can be very influential as to whether an ambiguity would
> be recognized, as well as the interpretation chosen by a
> reader.
>
> (A-207, ¶20).

Given the language typically used in blanket security interest financing statement collateral descriptions, one can reasonably conclude that a searcher would more likely conclude that the location language present here provides a limitation or restriction. However, it is not enough that more searchers than not would interpret the description one way or the other. So long as there is a substantial risk that a reasonable searcher would interpret it the wrong way, it should be deemed seriously misleading. This is not the situation where any hypothetical reasonable diligent searcher would locate a missing statement. Under that standard, no financing statements are missed. Instead, this is a situation where a set of reasonably diligent searchers may be mislead and a set of reasonably diligent searchers may not be mislead. A standard that picks one group over the other results in at least one group that remains seriously misled.

The revisions to the code show that such a result is not the intent of the drafters or legislature. The revisions show that while certain provisions make it simpler and easier on the secured creditor, such as filing without a debtor's signature and the use of "all assets" as a collateral description, there is more of a

42

burden on secured creditors in situations where a secured creditor has information and knowledge to avoid mistakes and errors that would likely lead to litigation. By enacting a statutory definition of "seriously misleading" in "debtor name" cases, the burden is placed on the secured creditor to get it right. The reasons behind the shift in focus under the revised code include, "to simplify the filing system as a whole . . . [and] shift the responsibility to the filer by requiring the not too heavy burden of using the legal name of the debtor." *Pankratz Implement Co. v. Citizens Nat'l Bank,* 281 Kan. 209, 227, 130 P.3d 57, 68 (Kan. 2006). "Post-revision law is fairly well settled that the burden is squarely on the creditor to correctly identify the name of the debtor." *John's Bean Farm of Homestead, Inc.,* 378 B.R. 385, 390 (Bankr. S.D. Fla. 2007). This is supported by practical considerations including, simplified drafting of financing statements, simplified searches, avoidance of litigation, and obtaining a debtor's legal name being not difficult or burdensome to the lending creditor. *First Community Bank of East Tennessee v. Jones,* 388 B.R. 317, 323 (Bankr. E.D. Tenn. 2008).

These considerations apply equally to the subject collateral description. The revised code provided for simplified drafting, avoidance of litigation and increased certainty in commercial transactions by allowing a secured creditor holding a blanket security interest to file a financing statement with a simple

43

recitation of "all assets." Given that "all assets" is all that is required, any ambiguity caused by any additional language that would reasonably lead a searcher to conclude that collateral was limited to less than an unlimited blanket interest, should be interpreted as being seriously misleading so as to limit perfection to the collateral unambiguously described. In the instant case, the additional language is simply not required, and a reasonable searcher may reasonably conclude (without recognizing the ambiguity) that it must be there for a reason. In other words, a reasonable searcher would conclude that the failure to simply use the phrase "all assets," where limiting language is evident and present, has meaning which is found within the four corners of the financing statement and anything it expressly references.

## H.  RELIANCE ON THE *PROGROWTH* CASE IS MISPLACED

Both the Bankruptcy Court and the District Court place great reliance on the case of *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.,* 558 F.3d 809 (8th cir. 2009) and its statement that "[w]here a description can reasonably be interpreted in one of two ways -- one of which may cover the collateral at issue and one of which does not -- notice filing has served its purpose of alerting subsequent creditors to the possibility that a piece of collateral may be covered; the burden is

then on the subsequent creditor to inquire further." 558 F.3d at 814.  A review of the case shows that this broad sweeping statement should be taken for what it is, *i.e.,* simply dicta, that wholly fails to articulate a rational legal standard.  In reviewing the collateral description at issue in the *ProGrowth* case, it is evident that there was no appreciable ambiguity.  The *ProGrowth* Court recognizes that the creditor used the supergeneric description of "all of Debtor's right, title, and interest in and to, assets and rights of Debtor . . . ." allowed by U.C.C. 9-504.  The description added "and all proceeds and products in that certain [annuity policy].  The language was clear and there was no reason to mistake the blanket nature of the *ProGrowth* description.  Instead the contention was that the description was misleading because the annuity policy reference was misidentified by number and issuing company.

The actual holding of *ProGrowth* is that "[w]e conclude the Defendants' financing statements satisfy the filing provisions of the Missouri UCC because they indicate coverage over all of Hanson's assets." 558 F.3d 813.  As a result, the misidentification of a particular item of collateral that was clearly and unequivocally within the all assets description was not seriously misleading.  Although First Niagara would be heard to make the same contention here, one need only look at the collateral descriptions in the two cases to see the serious and

45

critical differences. The legal standard that the *ProGrowth* court appears to articulate is *dicta*. It was unnecessary to the holding of that case. Further, it is a standard at odds with the intent of the revised code.

## I. THE *DURBIN* CASE REMAINS GOOD LAW

The court's decision *In re I.A. Durbin, Inc.*, 46 B.R. 595 (Bankr. S.D. Fla. 1985) is instructive. The *Durbin* Court framed the issue as follows:

> The resolution of the proceeding requires the determination of the legal sufficiency of a Uniform Commercial Code (U.C.C.) financing statement and the legal sufficiency of the defendant's affirmative defense of estoppel. At the outset, the Court notes that when evaluating a UCC financing statement, it is not necessary that any actual creditor be mislead. Rather, consistent with 11 USC §544, the Court must consider whether a hypothetical creditor could have been mislead."
> 46 B.R. at 597.

The collateral description at issue in the *Durbin* case provides:

> All property rights of any kind whatsoever, whether real, personal, mixed or otherwise, and whether tangible or intangible, encumbered by the above-mentioned mortgage.
> 46 B.R. at 598.

Despite the fact that it was undisputed that the debtor had pledged the contracts as security and the financing statement referred to "all property rights of any kind whatsever, . . . tangible or intangible . . . ," the Court held that the financing

46

statement limited perfection to only those intangible property rights described in the referenced mortgage. In other words, the Court held that the reference to the mortgage limited the language "all property rights of any kind whatsoever." The *Durbin* Court found "the defendant's financing statement to be deficient on two grounds: first, it failed to sufficiently describe the collateral and second, it was seriously misleading." 46 B.R. at 599.

The *Durbin* Court acknowledged the general rule that under the U.C.C. a description only needs to be sufficient to put a creditor on inquiry notice. Nonetheless, where the financing statement is seriously misleading or simply insufficient a third party prevails. As propounded by the *Durbin* Court:

> While the rule under the U.C.C. is that the description need only be sufficient to put a third party on inquiry notice that the secured party may have a security interest in the property described, **where the description is nonetheless seriously misleading or simply insufficient, a third party creditor is entitled to prevail against the creditor claiming under the defective financing agreement.** While fanatical exactitude of description is not required, significant omissions or material disparities between the financing statement and security agreement, that frustrate or forestall inquiry prevent lien perfection. **It has been observed that a third party stranger, such as a trustee in bankruptcy, is entitled to a greater measure of specificity and accuracy than the debtor itself. While third parties must use reasonable care in searching the records, they need not be prophets. This is consistent with the general rule that in a contest between the secured creditor and third parties, the greater burden shall fall on the party**

47

**who drafted the documents.** (Citations omitted) (emphasis supplied)
46 B.R. at 599-600.

The *Durbin* Court, was not giving greater scrutiny because a trustee is a hypothetical lien creditor. The *Durbin* Court was drawing a distinction between what the debtor and its lender understood the transaction to be, and a third party subsequent creditor, including a bankruptcy trustee.

As in the instant case, the creditor in the *Durbin* case argued that the language of "all property rights … tangible or intangible" was descriptive enough to include certain assigned contracts, or at least put a creditor on inquiry notice. However, the *Durbin* Court found that:

> [W]hile being overly broad by describing 'all property rights', the defendant's financing statement is at the same time specific and limited to all property rights 'encumbered by the mortgage' on the described real property.  * * * The presence of qualifying or limiting words in a financing statement description functions to limit the scope of perfection of a creditor's otherwise valid security interest.
> 46 B.R. at 600.

In further addressing the contention that a financing statement simply puts a creditor on inquiry notice for purposes of perfection and the scope thereof, the *Durbin* Court held that:

> There must be some limitation on the scope of the protection of notice filing to limit the investigation a third party must make.  The Court is unwilling to adopt a rule that

48

> would accord blanket protection to a creditor against the debtor-in-possession's avoiding powers under 11 USC §544(a) simply because the creditor filed a financing statement which describes some property. The mere filing of a financing statement, does not create a mandatory duty upon third parties to contact the debtor or creditor in every instance. Rather, it is only when the financing statement contains a sufficient description of the type or item of collateral that the duty pursue further inquiry arises.
>
> 46 B.R. at 601.

In articulating this standard the Court was simply emphasizing that a bankruptcy trustee does not have to show that an actual creditor of the debtor had been misled, rather the court must determine the case in light of a hypothetical creditor. The statement that a hypothetical creditor "could" have been misled is admittedly too broad since "could" suggests merely that it is possible. A better formulation would be "whether there is a reasonable likelihood that a searcher would not recognize any ambiguity and as a result is misled." The facts underlying the *Durbin* case would squarely satisfy that standard and it is likely that the Court meant to say that a hypothetical creditor "would" have been misled. This does not mean that all hypothetical creditors would be misled. As discussed above, so long as a reasonably diligent searcher would have been misled should sufficient. The *Durbin* Court also acknowledged the burden falling on the filer to properly draft the documents, which burden is now recognized in the revised code provisions.

Likewise, in *In re The Holladay House, Inc.,* 387 B.R. 689 (Bkrty. E.D. Va.

2008), *affirmed,* 2008 U.S. Dist. LEXIS 84405 (E.D. Va. 2008), the issue before

the Court was whether or not the financing statement sufficiently described

collateral in which the debtor had given a security interest under certain written

agreements. The financing statement at issue in *Holladay* referred to an attached

list, which described collateral more narrowly than did the security agreement.

The Court held that in order for a financing statement to be properly perfected:

> A sufficient description of the collateral is required 'to put
> third parties on notice of a possible lien on the collateral
> described, and when a description is insufficient, any lien
> is limited to the collateral properly described', where the
> description is seriously misleading or simply insufficient, a
> third party creditor or trustee in bankruptcy will be
> 'entitled to prevail against the creditor claiming under the
> defective financing statement'.
> 387 B.R. at 695.

In *Holladay*, even though the actual original security agreement was filed with the

financing statement, the Court held that the financing statement, which did not

specifically refer to the security agreement, was limited to the list attached to the

financing statement.

In *Holladay*, the Court rejected the creditor's argument that the filing of the

entire original security agreement was sufficient to put third parties on notice,

50

even though it was readily available for review.

> Where no such reference is expressly made by the financing statement, a reasonable title searcher is under no duty or obligation to do anything but rely upon the indication of collateral in the financing statement. The mere existence of a financing statement does not trigger a duty for third parties to inquire into the terms of the underlying security agreement. It does not recreate any duty to inquire into collateral that is not sufficiently described in the financing statement.
>
> *Holladay,* 387 BR at 696.

In sum, there are limitations on what gives rise to a searcher's duty of inquiry. If collateral is not sufficiently identified, the financing statement fails to perfect. There is no duty to inquire about collateral that is not sufficiently identified. Even if collateral is arguably identified, a financing statement will fail to perfect if it is seriously misleading. In such event, there is no duty to review the security agreement or inquire, even though it is evident that a creditor has a security interest in something. As supported by the evolution of the case law and code revisions in reaction to case law and furtherance of commercial policy, "seriously misleading" in collateral description cases should be based on a standard to the effect that there is a reasonable likelihood that a searcher would not recognize any ambiguity in the collateral description and as a result would be misled.

## CONCLUSION

For the foregoing reasons and based on the authorities hereinabove cited, the Decision and Order of the District Court should be reversed and an Order entered: (1) denying First Niagara's motion for judgment on the pleadings; (2) granting the Trustee's cross-motion for summary judgment on all seven (7) causes of action with regard to liability and related relief; (3) remand the matter to the Bankruptcy Court for further proceedings, including a trial to determine the nature, extent and value of the recovery to the Trustee; and (4) granting such other and further relief as is just and proper.

DATED:     August 4, 2016
           Buffalo, New York


                           Respectfully submitted,

           **AMIGONE, SANCHEZ & MATTREY, LLP**


           By:
                           Arthur G. Baumeister, Jr., Esq.
                            of Counsel
                           Attorneys for Plaintiff/Appellant
                           Office and P.O. Address
                           1300 Main Place Tower
                           350 Main Street
                           Buffalo, New York  14202
                           Phone:  (716) 852-1300
                           Email: abaumeister@amigonesanchez.com

                                52

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X ]  this brief contains no more than 10,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    [ ]  this brief uses a monospaced typeface and contains <state the number of> lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Office WORD 2007 in Times New roman 14-point, *or*

    [ ]  this brief has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

DATED:   August 4, 2016
         Buffalo, New York


                    **AMIGONE, SANCHEZ &  MATTREY, LLP**

                    By:
                       Arthur G. Baumeister, Jr., Esq.
                        of Counsel
                       Attorneys for Plaintiff/Appellant
                       Office and P.O. Address
                       1300 Main Place Tower
                       350 Main Street
                       Buffalo, New York  14202
                       Phone:  (716) 852-1300
                    Email: abaumeister@amigonesanchez.com